## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **JON P. JOYNER**<br><br>        **Plaintiff,**<br><br>    **v.**<br><br>**CHAD WOLF, ACTING SECRETARY,**<br>**UNITED STATES DEPARTMENT OF**<br>**HOMELAND SECURITY**<br><br>        **Defendant.** | **CIVIL NO. 2:19-CV-14234** |

## COMPLAINT

Plaintiff Jon Joyner asserts his causes of action against defendant Chad Wolf, solely in his official capacity as Acting Secretary of the United States Department of Homeland Security, regarding the unlawful employment actions of its agency, the United States Customs and Border Protection, as follows:

### THE PARTIES

1.    Plaintiff is Jon Joyner, a person of majority, currently domiciled in Mississippi.

2.    Defendant is Chad Wolf, solely in his official capacity, the Acting Secretary of the Department of Homeland Security (DHS), including its agency, United States Customs and Border Protection (CBP) (*see* 6 U.S.C. § 112(a) establishing the Secretary of DHS as the head of the department *and also* 6 U.S.C. § 211(e) establishing U.S. CBP).

### JURISDICTION AND VENUE

3.    The Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (federal question); 42 U.S.C. § 2000e-2 *et seq*. (Title VII disparate treatment); 42 U.S.C. § 2000e-3 *et seq*. (Title VII retaliation); and 42 U.S.C. § 2000e-16 (applicability of Title VII to federal employment) as more particularly set-out herein.

1

4.      The Court has personal jurisdiction over Mr. Wolf, in his official capacity and as the proper defendant representing the United States Department of Homeland Security (and its agency, U.S. Customs and Border Protection), because all of the unlawful employment practices alleged herein occurred in the state of Louisiana and give rise to the specific Title VII causes of action in this case, and thus Mr. Wolf, in his official capacity and as the proper defendant for DHS and CBP, has established minimum specific contacts with Louisiana, arising from the specific facts of this case, comporting with the requirements of fair play, substantial justice, and the Fourteenth Amendment of the Constitution of the United States.

5.      Venue for Mr. Joyner's Title VII claim is proper in this Court pursuant to 42 U.S.C. § 2000e-5(f)(3) because the alleged discriminatory employment practices occurred within this forum (specifically New Orleans), and Mr. Joyner would have continued to have been employed in his otherwise promoted position in this forum but for the his discriminatory non-selection at issue in this case.

## PROCEDURAL AND STATUTORY ALLEGATIONS

6.      At all relevant times, CBP employed more than 500 employees.

7.      In 1996, CPB hired Mr. Joyner (black) as a United States Border Patrol agent.

8.      Mr. Joyner has been continuously employed by CBP since that time and assigned to the Office of the United States Border Patrol.

9.      On or about March 30, 2018, CBP advertised a position for a Supervisory Border Patrol Agent (Division Chief) assigned to USBP's "New Orleans Sector" located in New Orleans, LA (announcement no. USBP-IMP-10168092-JRB).

10.     On or about April 11, 2018, Mr. Joyner timely applied for the position which, if received, would have constituted a significant promotion to Mr. Joyner in terms of pay, substantive

responsibilities, and supervisory responsibilities.

11.    Effective on or about October 14, 2018, the responsible management official with decision-making authority over the selection for the Division Chief position, Chief Patrol Agent Gregory Bovino, promoted USBP agent Christopher Bullock (white) to the Division Chief position over Mr. Joyner.

12.    Upon information and belief, the effective start date of Mr. Bullock's promotion to Division Chief was October 14, 2018.

13.    On November 28, 2018, Mr. Joyner timely initiated informal EEO contact alleging that CPA Bovino's decision to promote Mr. Bullock over Mr. Joyner was unlawful, discriminatory, and based on Mr. Joyner's race.

14.    On February 14, 2019, CBP issued its Notice of Right to File to Mr. Joyner.

15.    On February 28, 2019, Mr. Joyner timely filed his Individual Complaint of Employment Discrimination in this matter (case no. HS-CBP-00456-2019).

16.    On May 6, 2019, CBP took final action and dismissed Mr. Joyner's complaint.

17.    Mr. Joyner timely appealed CBP's dismissal to the EEOC.

18.    On September 10, 2019, the EEOC affirmed CBP's dismissal of Mr. Joyner's complaint.

19.    On September 10, 2019, the EEOC mailed notice of its final action to Mr. Joyner via USPS regular mail.

20.    Mr. Joyner timely files this federal complaint within 90 days of receiving EEOC's final decision in this matter.

## FACTS

### A.    The Plaintiff – Jon Joyner

21.    Jon Joyner is a 47-year-old man, who is black.

22.     Mr. Joyner is married, and he and his wife have one daughter together.

23.     Mr. Joyner began his full-time career as a United States Border Patrol Agent in 1996.

24.     Through excellent work and dedication to service, Mr. Joyner earned multiple promotions within the USBP and, both during the relevant times of this case and at present, was permanently assigned as the Patrol Agent in Charge of the Gulf Port Station, New Orleans Sector, located in Gulfport, Mississippi.

25.     At one time, through his hard work and dedication, Mr. Joyner was the highest ranking Black agent in the entire USBP.

**B.      The Employing Agency – U.S. Customs and Border Protection, Office of United States Border Patrol**

26.     As a USBP agent, Mr. Joyner is employed by United States Customs and Border Protection (CBP) and assigned to its Office of the United States Border Patrol.

27.     CBP is a statutory agency of the United States Department of Homeland Security.

28.     USBP is a statutory office of the CBP.

29.     At all relevant times, CBP employed more than 500 employees.

30.     USBP's statutory mission is to serve as the law enforcement office of CBP, and to interdict persons illegally entering or exiting the United States; interdict illegally imported or exported goods at points other than ports of entry; and deter and prevent the entry of terrorists, terrorist weapons, and other contraband.

**C.      USBP's Organizational and Leadership Structure**

31.     USBP's national headquarters is located in Washington D.C.

32.     USBP is geographically organized into "sectors," and each sector often cover multiple U.S. states, large linear stretches of the United States international border, and very large sections of United States territory.

33.    Each sector maintains its own leadership and support staff which provide leadership, supervision, and mission support throughout the region.

34.    The chief decision-maker with respect to all agency and personnel decisions at the sector-level is the Chief Patrol Agent (CPA).

35.    The executive officer who assists the CPA is the Deputy Chief Patrol Agent (DCPA).

36.    Typically, leadership at the sector-level then consists of different divisions, such as "division of law enforcement operations," or "division of operational support," and is headed-up by a Supervisory Border Patrol Agent, often referred to as a "Division Chief."

37.    USBP also employees civilians (as opposed to career agents), and when a civilian employee occupies a "Division Chief" position, they are sometimes referred to as a "Director" to signify their civilian status.

38.    Thus, leadership and command structure at the sector-level, and specifically the New Orleans Sector, often looks like this:



39.    Typically, at the sector level, the general schedule pay scale for Chief Patrol Officer and Deputy Chief Patrol Officer are GS-15.

40.    Typically, at the sector level, the general schedule pay scale for Division Chiefs and Directors are GS-15 or GS-14.

41.    Specifically at the New Orleans Sector, there are three Division Chief positions – (1) Division Chief of Law Enforcement Operations; (2) Division Chief of Operational Programs; and

(3) Division Chief of Operational Support.

42.     Further, each USBP sector is organizationally subdivided into "stations."

43.     Each station discharges local law enforcement operations of the surrounding territory.

44.     The chief decision-maker with respect to all agency and personnel decisions at the station-level is the Patrol Agent-in-Charge (PAIC).

45.     Typically, at the station level, the general schedule pay scale for PAIC's are GS-15, GS-14, or GS-13.

46.     During most of the relevant times in this case and also at present, Mr. Joyner was permanently assigned as the PAIC of USBP's Gulfport Station, New Orleans Sector, located in Gulfport, Mississippi, with pay grade GS-1896-13.

**D.     USBP's Leadership Structure Appears to Be Segregated Based on Race**

47.     Upon information and belief, a significant number of USBP agents are black or African American.

48.     Upon information and belief, USBP contains one national headquarters, twenty different sectors, and many stations, each with its own leadership structures.

49.     Upon information and belief, throughout the entire USBP, there are currently no black USBP agents who are assigned to permanent positions at the Associate Chief or higher at the USBP headquarters.

50.     Upon information and belief, throughout the entire USBP, there are currently no black USBP agents who are permanently assigned as Chief Patrol Agents.

51.     Upon information and belief, throughout the entire USBP, there are currently no black USBP agents who are permanently assigned as Deputy Chief Patrol Agents.

52.    Upon information and belief, throughout the entire USBP, there are currently no black USBP agents who are permanently assigned as Division Chiefs or Directors.

53.    Upon information and belief, there are no black USPB agents who occupy positions with general schedule pay scales of GS-15.

54.    Upon information and belief, there is, in effect, a complete lack of any black USBP agents who occupy any senior leadership positions throughout the entirety of the United States Border Patrol, despite the fact that black USBP agents represent a significant, statistical composition of the total USBP workforce.

55.    Upon information and belief, for the reasons described above, the USBP is currently and de facto segregated based on race.

56.    Upon information and belief, there is a de facto glass ceiling for black and African American USBP agents at the GS-14 level – meaning, that upon information and belief, permanent promotion opportunities are simply denied to black and African American USBP agents past the PAIC level.

**E.    Mr. Joyner Is Previously the Highest-Ranking Black Agent in the Border Patrol**

57.    Prior to his posting as PAIC of Gulfport Station, Mr. Joyner was assigned as the Division Chief of Law Enforcement Operations at USBP's Ramey Sector, located in Puerto Rico, which jurisdictionally covers all of Puerto Rico and the U.S. Virgin Islands.

58.    During this time, Mr. Joyner held the pay grade of GS-14 and was, to the best of his knowledge, the highest ranking Black agent within all of the Border Patrol.

59.    In September 2017, Hurricane Maria made landfall in Puerto Rico, severely damaging the island and its infrastructure.

60.    At the time, Mr. Joyner lived in Puerto Rico with his wife and minor child.

61.    A while thereafter, in the best interests of his family, Mr. Joyner applied for an opening to become the new PAIC of Gulfport Station, New Orleans Sector, in Gulfport, Mississippi.

62.    Mr. Joyner was selected for the position and accepted, despite the fact that it represented a demotion in terms of both pay grade and responsibility.

63.    Mr. Joyner's plan was to relocate his family to the continental United States, and then re-apply for leadership positions within Border Patrol based on his prior expertise, training, and work.

**F.    Mr. Joyner Hits the Glass Ceiling**

64.    During 2017, the CPA of New Orleans Sector was John Richards (white).

65.    Later, CPA Richards retired, and the then-Deputy Chief Patrol Agent of New Orleans Sector, Joseph Banco (white), became Acting Chief Patrol Agent for the sector.

66.    This personnel movement ultimately opened a vacancy for the New Orleans Sector position of Division Chief of Operational Programs.

67.    On or about March 30, 2018, ACPA Banco announced the opening for the permanent position for Division Chief of Operational Programs via USAJobs.com.

68.    On April 11, 2018, Mr. Joyner applied for the position via USAJobs.com.

69.    ACPA Banco selected Mr. Joyner to interview for the position with himself and the then-acting Deputy Chief Patrol Agent of New Orleans Sector, Teresa Pedregon (white, Hispanic).

70.    However, during the intervening time period, USBP selected agent Gregory Bovino to become the new, permanent Chief Patrol Agent of New Orleans Sector.

71.    Upon information and belief, CPA Bovino harbors racial, sex, and color bias, and favors white, non-Hispanic men over all other demographics of agents.

72.    On May 11, 2018, before Mr. Joyner could interview for the Division Chief position, CPA Bovino cancelled the job posting, specifically indicating in the cancellation that the position would

be re-posted via USAJobs.com at a later date.

73.     Nevertheless, CPA Bovino did not competitively repost the Division Chief position on USAJobs.com.

74.     Instead, CPA Bovino laterally promoted another agent currently serving outside of New Orleans Sector, Christopher Bullock, to become the new, permanent, Division Chief of Operational Programs.

75.     Upon information and belief, at the time in question, USBP had issued formal guidance specifically disapproving (although not outright prohibiting) lateral promotions in favor of competitive job announcements via USAJobs.com.

76.     Mr. Bullock's effective start date in the position of Division Chief of Operational Programs was October 14, 2019.

77.     Upon information and belief, Mr. Joyner is objectively more qualified to serve as Division Chief of Operational Programs in New Orleans Sector than Mr. Bullock.

78.     Upon information and belief, while Mr. Joyner had previously held the permanent position of Division Chief of Law Enforcement Operations (at Ramey Sector in Puerto Rico), which is in fact considered within USBP to be a more prestigious and leadership-intensive position than Division Chief of Operational Programs, while Mr. Bulloch had never held any Division Chief or Patrol Agent in Charge positions whatsoever anywhere within USBP.

79.     Upon information and belief, had CPA Bovino competitively advertised for the Division Chief position as he previously indicated, Mr. Joyner would have objectively socred better than Mr. Bulloch on any unbiased grading rubric or matrix.

80.     Knowing this, CPA Bovino specifically avoided a competitive announcement so that he could laterally promote Mr. Bulloch to the position of Division Chief.

81.    More specifically, upon information and belief, CPA Bovino originally cancelled the posting for the Division Chief position because he did not want to promote Mr. Joyner to the position because of his race.

82.    More specifically, upon information and belief, CPA Bovino would have selected Mr. Joyner as the Division Chief of Operational Programs, effective October 14, 2018, had Mr. Joyner been white.

83.    Upon information and belief, CPA Bovino only undertook these personnel decisions with respect to Mr. Joyner and Mr. Bullock because he had either explicit or implicit authorization to do so from senior leadership at USBP Headquarters in Washington D.C.

84.    Upon information and belief, senior leadership at USBP Headquarters either directly or indirectly directs discriminatory personnel actions, such as and including Mr. Joyner's non-selection for the Division Chief position, because of systemic, disparate attitudes regarding race.

85.    That is to say, upon information and belief, senior leadership at USBP Headquarters either directly or indirectly directs discriminatory personnel actions that promote USBP agents who are white over agents who are not white.

86.    Later, after Deputy Chief Patrol Agent Banco retired, CPA Bovino temporarily promoted Mr. Bulllock to the more senior Division Chief position, "Division Chief of Law Enforcement Operations."

87.    This created a new, temporary opening in the Division Chief of Operational Programs position.

88.    CPA Bovino promoted another agent, Robert Rivet (white), into that position.

89.    Previously, Mr. Rivet had served as an Operations Officer at the New Orleans Sector – a position that was less senior than Mr. Joyner's position of PAIC of Gulf Port Station.

90.    Thus, for a time, CPA Bovino promoted, without competitively advertising the position, an agent who was less senior to Mr. Joyner into the Acting Division Chief of Operational Programs position – such that Mr. Joyner during this time actually reported to Mr. Rivet.

91.    At present, Mr. Joyner still serves in his permanent position of PAIC Gulf Port Station.

**G.    USBP Engages in a Retaliation Campaign Against Mr. Joyner After He Files His EEO Complaint in This Case**

92.    As alleged throughout this complaint, Mr. Joyner filed his original complaint of discrimination in this matter on or about February 28, 2019.

93.    In the weeks and months both before and after Mr. Joyner filed his complaint, Mr. Joyner has made exceptional effort to win re-assignment to another posting or sector to avoid the racist work environment at New Orleans Sector.

94.    However, upon information and belief, Mr. Joyner was immediately targeted for retaliation by either CPA Bovino or others within USBP Washington D.C. headquarters.

95.    Specifically, upon information and belief, Mr. Joyner has applied for 26 positions or promotions since November 2018.

96.    In each instance, Mr. Joyner was demonstrably qualified for the position he applied for.

97.    However, in each instance Mr. Joyner was not selected for the position.

98.    Upon information and belief, CPA Bovino or officials at USBP's Washington D.C. headquarters, or both, either directly selected a candidate other than Joyner for these positions, or provided negative recommendations against Joyner's selection, for the specific purpose of retaliating against Joyner for filing his February 28, 2019 complaint of discrimination in this matter.

99.    Specifically, the following are the positions (with associated GS-scale pay grade, USAJobs.com announcement number, location of posting, announcement closing date, and the

date that Mr. Joyner was notified of his non-selection) that Mr. Joyner applied for but, as alleged, was not selected for in retaliation for filing his complaint of discrimination in this matter:

(a) Watch Commander, GS-1896-14, USBP-IMP-10357693-HH (Sonoita, AZ), Closed 11/29/2018 (Not Selected) (notified 4/4/2019);

(b) ACPA, GS-1896-14, USBP-IMP-10357611-HH (Tucson, AZ), Closed 11/29/2018 (Not Selected) (notified 4/4/2019);

(c) ACPA, GS-1896-14, USBP-IMP-10361252-HH (Tucson, AZ), Closed 12/04/2018 (Not Selected) (notified 4/4/2019);

(d) Watch Commander, GS 1896-14, USBP-IMP-10366057 (Casa Grande, AZ), Closed 12/14/2018 (Not Selected) (notified 4/4/2019);

(e) DCPA, GS-1896-15, USBP-IMP-10386844 (New Orleans, LA), Closed 1/4/2019 (Not Selected) (notified 5/17/2019);

(f) DPAIC, GS-1896-14, USBP-IMP-10387097-HH (Tucson, AZ), Closed 2/11/2019 (Not Selected) (notified 4-3-2019);

(g) DPAIC, GS-1896-14, USBP-IMP-10428888-HH (Nogales, AZ), Closed 3/6/2019 (Interviewed, Not Selected) (notified 5/29/2019);

(h) ACTT Director, GS-1896-15, USBP-IMP-10427945-HH (Tucson, AZ), Closed 3/7/2019 (Not Selected) (notified 5/29/2019);

(i) PAIC, GS-1896-14, USBP-IMP-10429075-HH (Three Points, AZ), Closed 3/12/2019 (Interviewed, Not Selected) (notified 6/11/2019);

(j) ACPA, GS-1896-14, USBP-IMP-10457737-HH (Tucson, AZ), Closed 4/4/2019 (Not Selected) (notified 6/25/2019);

(k) DCPA, GS-1896-15, USBP-IMP-10458934-PFT (Marfa, TX ), Closed 4/19/2019

(Not Referred) (notified 4/29/2019);

(l)     ACTT Director, GS-1896-15, USBP-IMP-10465592 (Marfa, TX), Closed 4/17/2019 (Interviewed, Not Selected) (notified 8/19/2019);

(m)    DCPA, GS-1896-15, USBP-IMP-10473790-TCP (Aguadilla, PR), Closed 5/2/2019 (Not Selected) (notified 5/15/2019);

(n)     ACPA GS-1896-14, OC-IMP-10486778 (Aguadilla, PR), Closed 5/9/2019 (Interviewed, Not Selected) (notified 8/23/19);

(o)     Watch Commander, USBP-IMP-10489715-HH (Willcox, AZ), Closed 5/13/2019 (Not Selected) (notified 8/8/2019);

(p)     Division Chief Tucson, USBP-IMP-10499379-HH (Tucson, AZ) Closed 5/22/2019 (Not Selected) (notified 9/3/2019);

(q)     DPAIC, GS-1896-14, USBP-IMP-10508046-HH (Tucson, AZ), Closed 5/31/2019 (Not Selected) (notified 8/23/2019);

(r)     Watch Commander, USBP-IMP-10508053-HH (Nogales, AZ), Closed 6/3/2019 (Not Selected) (notified 8/23/2019);

(s)     PAIC, GS-1896-14, USBP-10510255-HH (Wilcox, AZ), Closed 6/14/2019 (Not Selected) (notified 8/23/2019);

(t)     DPAIC, GS-1896-14, USBP-IMP-10514967 (Wellton, AZ), Closed 6/14/2019 (Not Selected) (Mr. Joyner was never formally given notice of his non-selection, but understands that the position has since been filled);

(u)     DPAIC, GS-1896-14, USBP-IMP-10523915-WR (Blythe, CA), Closed 6/20/2019 (Not Selected) (Mr. Joyner was never formally given notice of his non-selection, but understands that the position has since been filled);

    (v)    ACPA, GS-1896-14, USBP-IMP-10528716-XYA (El Paso, TX), Closed 6/24/2019 (Not Selected) (notified 8/28/2019);

    (w)    PAIC, GS-1896-14, USBP-IMP-10532623-HH (Tucson, AZ) Closed 7/2/2019 (Not Selected) (notified 9/3/2019);

    (x)    Watch Commander, GS-1896-14, USBP-IMP-10597537-HH (Tucson, AZ), Closed 9/18/2019 (Not Selected) (notified 12/5/2019);

    (y)    DPAIC, GS-1896-14, USBP-IMP-10608634-JAK (El Paso, TX), Closed 9/30/2019 (Not Selected) (Mr. Joyner was never formally given notice of his non-selection, but understands that the position has since been filled); and,

    (z)    Watch Commander, GS-1896-14, USBP-IMP-10622248-HH (Nogales, AZ / Sonoita, AZ), Closed 10/17/2019 (Not Selected) (Mr. Joyner was never formally given notice of his non-selection, but understands that the position has since been filled).

100.    Upon information and belief, had Mr. Joyner never filed the complaint of discrimination in this case, he would have ultimately been selected for any of these positions based on his qualifications, experience, prior leadership, and the fact that he had previously discharged the duties of Division Chief of Law Enforcement Operations at USBP's Ramey Sector in Puerto Rico, which is a GS-14 pay grade position identical in pay grade to many of the positions that Mr. Joyner applied for but was not selected.

## H.    The Aftermath

101.    Because of his discriminatory and retaliatory non-selections alleged throughout this complaint, Mr. Joyner is out significant lost back and future wages.

102.    Because of his discriminatory and retaliatory non-selections alleged throughout this

complaint, Mr. Joyner has suffered non-compensatory damages including for stress, loss of reputation, mental anguish, and loss of enjoyment of life.

103.     Specifically, the racist environment that Mr. Joyner has been forced to endure has caused him and his family considerable and constant stress, such that Mr. Joyner has long sought re-assignment away from New Orleans Sector, and, anticipating this eventual move, and to protect his family from the continued race-related stress of his workplace, Mr. Joyner's wife and minor child have already moved away to Arizona.

104.     Additionally, because of his discriminatory and retaliatory non-selections alleged throughout this complaint, Mr. Joyner is out future promotion opportunities and associated lost future wages.

105.     Additionally, because of his discriminatory and retaliatory non-selections alleged throughout this complaint, Mr. Joyner has been forced to retain an attorney in this matter and has incurred reasonable attorney's fees and litigation costs.

## CAUSES OF ACTION

### A.     Unlawful Disparate Treatment Race Discrimination Under Title VII

106.     Mr. Joyner states a cause of action against defendant for unlawful disparate-treatment discrimination based on his race (black) concerning his non-selection for the position of permanent Division Chief of Operational Programs at New Orleans Sector in favor of his white comparator, Christopher Bullock.

107.     Title VII of the Civil Rights Act of 1964 (as amended) forbids an employer from discriminating against any employee on account of the person's race.  42 U.S.C. §2000e-2(a)(1). An employer illegally discharges an employee based on his race when race is at least one of the factors motivating the discharge.  *Richardson v. Monitronics Int'l, Inc.*, 434 F.3d 327, 333 (5th

Cir. 2005); *cf* 42 U.S.C. § 2000e–2(m) (codifying that an employee proves unlawful discrimination when a protected status "was a motivating factor for any employment practice, even though other factors also motivated the practice"). When direct evidence of discrimination is not available, an employee may prove his case with circumstantial evidence that he "(1) is a member of a protected class; (2) was qualified for the position; (3) was subjected to an adverse employment action; and (4) was replaced by someone outside the protected class, or in the case of disparate treatment, shows that other similarly situated employees [not in the protected class] were treated more favorably." *Bryan v. McKinsey & Co.,* 375 F.3d 358, 360 (5th Cir. 2004).

108. Alternatively, "[s]tatistical evidence is also of central importance in a disparate treatment case[,]" and an employee may prove his prima facie case statistically "if gross statistical disparities in the composition of an employer's work force can be shown." *Pouncy v. Prudential Ins. Co. of Am.*, 668 F.2d 795, 802 (5th Cir. 1982). Specifically, when "the statistical showing is sufficiently strong in a disparate treatment action, [an employee's] prima facie case can be made without additional evidence establishing that defendant purposefully treated minorities protected under Title VII less favorably than other persons." *Id.* "If statistical evidence is insufficient to establish discriminatory intent, [employees] may bolster their case by introducing historical, individual, or circumstantial evidence." *Anderson v. Douglas & Lomason Co., Inc.*, 26 F.3d 1277, 1285 (5th Cir. 1994).

109. Finally, in a Title VII action, an employer is vicariously liable for its manager's discriminatory acts when the manager serves as the employer's agent, or when the employer knew or should have known of the manager's discriminatory conduct and took no remedial action. *See e.g.*, *Flanagan v. Aaron E. Henry Cmty. Health Servs. Ctr.*, 876 F.2d 1231, 1235 (5th Cir. 1989).

110. In this case, U.S. Customs and Border Protection, and its Office of United States Border

Patrol, has a statistically apparent and historical pattern of denying promotion opportunities to black and African American agents in favor of promoting predominantly white agents (and usually white, male agents) to the senior-most leadership positions at the sector-level, headquarters, and across the entire GS-15 pay scale.

111.    Additionally, and specifically in this case, the personnel decisions of USBP and CPA Bovino against Mr. Joyner were upon information and belief specifically motivated by race-based animus.

112.    Specifically, in 2018, former Acting CPA Banco competitively advertised for the permanent position of Division Chief of Operational Programs at New Orleans Sector; Mr. Joyner applied and was scheduled to interview; but almost immediately after assuming the duties of Chief Patrol Agent, CPA Bovino cancelled the posting.  CPA Bovino indicated that the position would be re-advertised in the future, but in hindsight this was not true.

113.    Then, effective on October 14, 2018, and without notice or competitive posting, CPA Bovino laterally promoted and hired of a white, male comparator who was demonstrably less qualified than Mr. Joyner to assume the permanent position of Division Chief of Operational Programs.  This was done despite the apparent USBP policy against lateral promotions in favor of competitive job postings.

114.    Mr. Joyner timely initiated the EEO process within 45 days of the effective start date of Mr. Bullock's promotion to the Division Chief position, and Mr. Joyner specifically complained that the adverse non-selection was motivated by race-based animus in violation of Title VII.  Mr. Joyner ultimately exhausted his administrative remedies and timely filed this lawsuit.

115.    During the pendency of Mr. Joyner's EEO process, CPA Bovino briefly promoted a less-senior, white, male agent to the Acting Division Chief of Operational Programs over Mr. Joyner.

116.    Upon information and belief, CPA Bovino promoted Christopher Bullock over Mr. Joyner to the permanent position of Division Chief of Operational Programs because of race-based animus in favor of Mr. Bullock and against Mr. Joyner.  Stated another way, had Mr. Joyner been white, CPA Bovino would have promoted Mr. Joyner to the permanent Division Chief of Operational Programs position.  Upon information and belief, CPA Bovino made these adverse personnel decisions with either explicit or implicit instructions from senior decision-makers at USBP headquarters.

117.    Accordingly, CPA Bovino's decision to promote Christopher Bullock over Mr. Joyner, effective October 14, 2018, to the permanent position of Division Chief of Operational Programs constituted an adverse personnel action, specifically an adverse non-selection for promotion, in violation of Title VII.

118.    At all times, the decisions of CPA Bovino and senior leadership officials at USBP headquarters were done purposefully, within the course and scope of their duties, and as agents of Customs and Border Protection.

119.    Accordingly, Customs and Border Protection and the United States Border Patrol is liable for all actual and statutory damages suffered by Mr. Joyner resulting from CBP and USBP's illegal and racially motivated employment actions, including, but limited to, back pay, front pay, compensatory damages, mental anguish damages, and his reasonable attorney's fees incurred in this action, and CBP is liable to reinstate Mr. Joyner to the position of Division Chief for which he was unlawfully not selected, or position of identical or senior grade, so long as that reinstated position is not within the New Orleans Sector of USBP.

**B.**    **Unlawful Retaliation Under Title VII**

120.    Mr. Joyner states a cause of action against defendant for unlawful retaliation concerning his multiple non-selections for the following promotions and positions:

(a)    Watch Commander, GS-1896-14, USBP-IMP-10357693-HH (Sonoita, AZ), Closed 11/29/2018 (Not Selected) (notified 4/4/2019);

(b)    ACPA, GS-1896-14, USBP-IMP-10357611-HH (Tucson, AZ), Closed 11/29/2018 (Not Selected) (notified 4/4/2019);

(c)    ACPA, GS-1896-14, USBP-IMP-10361252-HH (Tucson, AZ), Closed 12/04/2018 (Not Selected) (notified 4/4/2019);

(d)    Watch Commander, GS 1896-14, USBP-IMP-10366057 (Casa Grande, AZ), Closed 12/14/2018 (Not Selected) (notified 4/4/2019);

(e)    DCPA, GS-1896-15, USBP-IMP-10386844 (New Orleans, LA), Closed 1/4/2019 (Not Selected) (notified 5/17/2019);

(f)    DPAIC, GS-1896-14, USBP-IMP-10387097-HH (Tucson, AZ), Closed 2/11/2019 (Not Selected) (notified 4-3-2019);

(g)    DPAIC, GS-1896-14, USBP-IMP-10428888-HH (Nogales, AZ), Closed 3/6/2019 (Interviewed, Not Selected) (notified 5/29/2019);

(h)    ACTT Director, GS-1896-15, USBP-IMP-10427945-HH (Tucson, AZ), Closed 3/7/2019 (Not Selected) (notified 5/29/2019);

(i)    PAIC, GS-1896-14, USBP-IMP-10429075-HH (Three Points, AZ), Closed 3/12/2019 (Interviewed, Not Selected) (notified 6/11/2019);

(j)    ACPA, GS-1896-14, USBP-IMP-10457737-HH (Tucson, AZ), Closed 4/4/2019 (Not Selected) (notified 6/25/2019);

(k)    DCPA, GS-1896-15, USBP-IMP-10458934-PFT (Marfa, TX ), Closed 4/19/2019 (Not Referred) (notified 4/29/2019);

(l)    ACTT Director, GS-1896-15, USBP-IMP-10465592 (Marfa, TX), Closed 4/17/2019 (Interviewed, Not Selected) (notified 8/19/2019);

(m)    DCPA, GS-1896-15, USBP-IMP-10473790-TCP (Aguadilla, PR), Closed 5/2/2019 (Not Selected) (notified 5/15/2019);

(n)    ACPA GS-1896-14, OC-IMP-10486778 (Aguadilla, PR), Closed 5/9/2019 (Interviewed, Not Selected) (notified 8/23/19);

(o)    Watch Commander, USBP-IMP-10489715-HH (Willcox, AZ), Closed 5/13/2019 (Not Selected) (notified 8/8/2019);

(p)    Division Chief Tucson, USBP-IMP-10499379-HH (Tucson, AZ) Closed 5/22/2019 (Not Selected) (notified 9/3/2019);

(q)    DPAIC, GS-1896-14, USBP-IMP-10508046-HH (Tucson, AZ), Closed 5/31/2019 (Not Selected) (notified 8/23/2019);

(r)    Watch Commander, USBP-IMP-10508053-HH (Nogales, AZ), Closed 6/3/2019 (Not Selected) (notified 8/23/2019);

(s)    PAIC, GS-1896-14, USBP-10510255-HH (Wilcox, AZ), Closed 6/14/2019 (Not Selected) (notified 8/23/2019);

(t)    DPAIC, GS-1896-14, USBP-IMP-10514967 (Wellton, AZ), Closed 6/14/2019 (Not Selected) (Mr. Joyner was never formally given notice of his non-selection, but understands that the position has since been filled);

(u)    DPAIC, GS-1896-14, USBP-IMP-10523915-WR (Blythe, CA), Closed 6/20/2019 (Not Selected) (Mr. Joyner was never formally given notice of his non-

selection, but understands that the position has since been filled);

(v)     ACPA,      GS-1896-14,      USBP-IMP-10528716-XYA      (El      Paso,      TX),

Closed  6/24/2019 (Not Selected) (notified 8/28/2019);

(w)     PAIC, GS-1896-14, USBP-IMP-10532623-HH (Tucson, AZ) Closed 7/2/2019

(Not Selected) (notified 9/3/2019);

(x)     Watch  Commander,  GS-1896-14,  USBP-IMP-10597537-HH  (Tucson,  AZ),

Closed 9/18/2019 (Not Selected) (notified 12/5/2019);

(y)     DPAIC, GS-1896-14, USBP-IMP-10608634-JAK (El Paso, TX), Closed 9/30/2019

(Not Selected) (Mr. Joyner was never formally given notice of his non-selection,

but understands that the position has since been filled); and,

(z)     Watch  Commander,  GS-1896-14, USBP-IMP-10622248-HH  (Nogales,  AZ  /

Sonoita, AZ), Closed 10/17/2019 (Not Selected) (Mr. Joyner was never formally

given notice of his non-selection, but understands that the position has since been

filled).

121.    Pursuant to Title VII of the Civil Rights Act of 1964 (as amended), an employer may not

discriminate against an employee "because he has opposed any practice made an unlawful

employment practice under [Title VII], or because he has made a charge, testified, assisted, or

participated in any manner in an investigation, proceeding, or hearing under [Title VII]. 42 U.S.C.

§2000e-3(a).  In a retaliation case, "an adverse employment action is one that 'a reasonable

employee would have found . . . [to be] materially adverse, which in this context means it might

well have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"

*Id.* (citing *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. 53 (2006)).  "Close timing between an

employee's protected activity and an adverse action against him may provide the 'causal

connection' required to make out a prima facie case of retaliation." *McCoy v. City of Shreveport*, 492 F.3d 551, 562 (5th Cir. 2007) (quoting *Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1188 (5th Cir. 1997)).  Just as in a Title VII discrimination case, an employer remains vicariously liable for the acts of its decision-maker when the decision-maker serves as the employer's agent, or when the employer knew or should have known of the decision-maker's discriminatory conduct and took no remedial action.  *See e.g.*, *Flanagan v. Aaron E. Henry Cmty. Health Servs. Ctr.*, 876 F.2d 1231, 1235 (5th Cir. 1989).  A federal employer who violates Title VII is liable for the victim's back wages, front wages, reinstatement, statutory damages, attorney's fees, and litigation costs.

122.    Further, a plaintiff who alleges unlawful retaliation that grows out of a previously filed and exhausted EEO charge is not required to administratively exhaust the subsequent and related retaliation claim.  *Gupta v. E. Texas State Univ.*, 654 F.2d 411, 414 (5th Cir. 1981) ("[W]e hold that it is unnecessary for a plaintiff to exhaust administrative remedies prior to urging a retaliation claim growing out of an earlier charge"); *accord Eberle v. Gonzales*, 240 Fed. Appx. 622, 628 (5th Cir. 2007) (recognizing applicability of the so-called "*Gupta* exception" in federal EEO cases).

123.    In this case, as alleged, Mr. Joyner was an exceptional performer who, prior to his voluntary re-assignment in the aftermath of Hurricane Maria, was the highest ranking Black or African American agent in the entire USBP.  Inexplicably, once Mr. Joyner began applying for positions or promotions outside of New Orleans Sector, he was systematically rejected 26 times in a row for positions for which not only was Mr. Joyner demonstrably qualified, but many of which were less senior in terms of leadership responsibility compared to positions Mr. Joyner had previously held.  Upon information and belief, either CPA Bovino, officials at USBP's Washington D.C. headquarters, or both intentionally retaliated against Mr. Joyner because of his previously filed complaint in this case by either directly not selecting him for these positions, or by making negative

recommendations or evaluations to ensure that he was not selected. Stated another way, had Mr. Joyner never filed his complaint of discrimination in this case, he ultimately would have been selected for any of these positions.

124.    Accordingly, Customs and Border Protection and the United States Border Patrol are liable for all actual and statutory damages suffered by Mr. Joyner resulting from CBP and USBP's illegal and racially motivated employment actions, including, but limited to, back pay, front pay, compensatory damages, mental anguish damages, and his reasonable attorney's fees incurred in this action, and CBP is liable to reinstate Mr. Joyner to the most senior position for which Mr. Joyner was unlawfully not selected in retaliation for his prior protected activity in this case.

**JURY DEMAND**

Mr. Joyner requests a trial by jury on all claims and causes of action asserted in this matter.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff Jon P. Joyner prays that his complaint be deemed good and sufficient; that it and summons be served upon defendant Chad Wolf, solely in his official capacity as Acting Secretary of the United States Department of Homeland Security; and, after due proceedings are had, that judgment be entered in favor of plaintiff and against defendant for (1) all damages and equitable relief due to plaintiff, including compensatory damages, statutory damages, costs, attorney's fees, and legal interest from the date of demand; (2) an injunction ordering defendant to reinstate Mr. Joyner to the most senior position within USBP for which Mr. Joyner was unlawfully not selected or which equity otherwise requires; and (3) an injunction prohibiting defendant from engaging in all current and future race-based discrimination against black and African American USBP agents seeking promotion to any GS-14, GS-15, or higher general schedule pay grade, and to further enjoin defendant from engaging in unlawful retaliation against

any employees for prior, protected EEO activity; and for all other general and equitable relief plaintiff is entitled.

Respectfully submitted:

/s/ Kevin S. Vogeltanz
Kevin S. Vogeltanz, TA (Bar #32746)
The Law Office of Kevin S. Vogeltanz, LLC
823 Carroll Street, Suite A
Mandeville, LA 70448
Telephone:  (504) 275-5149
Facsimile:  (504) 910-1704
Email:  vogeltanz@gmail.com

*Counsel for Jon P. Joyner*